## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 12-cr-251 (EGS) |
|  | ) | **FILED** |
|  | ) | VIOLATIONS: |
|  | ) | DEC - 3 2012 |
| v. | ) | 18 U.S.C. § 371 |
|  | ) | (Conspiracy) |
|  | ) |  |
| CHINA NUCLEAR INDUSTRY HUAXING | ) | 50 U.S.C. § 1705 |
| CONSTRUCTION CO., LTD. | ) |  |
|  | ) | (International Emergency |
| No. 79 Yunlongshan Road | ) | Economic Powers Act) |
| Jianyie District | ) |  |
| Nanjing City, Jiangsu Province | ) | 15 C.F.R. Parts 730–774 |
| People's Republic of China | ) | (Export Administration |
|  | ) | Regulations) |
| Defendant. | ) |  |
|  | ) | 18 U.S.C. § 2 |
|  | ) | (Causing an Act to Be Done) |
|  | ) |  |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

Had this case gone to trial, the United States would have proven beyond a reasonable

doubt that:

Beginning on or about June 15, 2006, and continuing through in or around March 2007,

within the District of Columbia and elsewhere, defendant **CHINA NUCLEAR INDUSTRY**

**HUAXING CONSTRUCTION CO., LTD. ("HUAXING")**, did knowingly conspire with

others known and unknown, to violate the International Emergency Economic Powers Act

("IEEPA") and the Export Administration Regulations ("EAR") by causing the export, reexport

and transshipment of certain high performance coatings from the United States to restricted

entities in Pakistan without obtaining the necessary license from the Department of Commerce,

located in the District of Columbia.

DEFENDANT'S
EXHIBIT

**Defendant and Other Entities**

1.      The **CHINA NUCLEAR INDUSTRY HAUXING CONSTRUCTION CO.**

**LTD.** was a Chinese construction company specializing in nuclear engineering, nuclear power

engineering and military engineering.   Its principal place of business and headquarters was in

Nanjing City, People's Republic of China ("PRC").   **HUAXING** was a contractor responsible

for applying coatings during the construction of the Chashma Nuclear Power Plant No. II

("Chashma II") in Pakistan.

2.      PPG Paints Trading (Shanghai) Co., Ltd. ("PPG Paints Trading"), a

wholly-owned subsidiary of PPG Industries, Inc. ("PPG Industries"), was a Chinese corporation

with its principal place of business in Shanghai, China.   PPG Paints Trading was engaged in the

business of importing and exporting architectural, refinish, industrial and packaging coatings on

behalf of various PPG Industries' business units.

3.      PPG Industries was a publicly-held United States corporation with its principal

place of business in Pittsburgh, Pennsylvania.   PPG Industries was a major global manufacturer

and supplier of chemicals, glass, fiberglass, and architectural, industrial and performance

coatings.

4.      Xun Wang was a Chinese national and lawful permanent resident of the United

States.   From in or around May 2006 until in or around September 2007, Xun Wang held the

position of Managing Director of Architectural Coatings at PPG Paints Trading.

5.      Company A was a Chinese distributor of coatings located in Shanghai, PRC.

2

**Relevant Legal Authorities**

6.     The United States Department of Commerce ("DoC"), located in the District of

Columbia, had the authority to prohibit or curtail the export of goods and technologies from the

United States to foreign countries and entities, as necessary, to protect, among other things, the

national security and foreign policy of the United States.   The DoC implemented that authority

through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, which

restricted the export of certain goods and technologies unless authorized by the DoC through

issuance of a valid export license.

7.     Under provisions of the International Emergency Economic Powers Act

("IEEPA"), 50 U.S.C. §§ 1701-1706, the President of the United States had the power to regulate

exports and other international transactions in times of national emergency, as triggered by

national security, foreign policy or economic concerns stemming from the unrestricted access by

foreign parties to United States goods and technologies.   By virtue of Executive Order 13222

and annual notices issued by the President pursuant to his authority under IEEPA, the EAR

continued in full force and effect at all times relevant to the Information.

8.     The DoC's Bureau of Industry and Security ("BIS") published a list of restricted

entities (the "Entity List") found in Supplement No. 4 to Part 744 of the EAR.   Entities were

placed on the Entity List because they engaged in activities that could result in an increased risk

of diversion of exported items to weapons of mass destruction programs, to nuclear proliferation

activities, to activities sanctioned by the Department of State, and to activities contrary to our

national security and foreign policy interests.   Entities on the Entity list were ineligible to

3

receive U.S. exported goods subject to the EAR without issuance of a valid DoC export license

to the extent specified in Supplement No. 4 to Part 744.11(b) of the EAR.

## Export and Shipping Records

9.     Pursuant to United States law and regulation, exporters and shippers or freight

forwarders are required to file certain forms and declarations concerning exports of goods and

technology from the United States.     Typically, those filings are completed through the

submission of a paper Shipper's Export Declaration ("SED") or the submission of Electronic

Export Information ("EEI") via the Automated Export System.     The SEDs and EEIs are official

documents submitted to the United States Government in connection with exports from the

United States.     An SED or EEI must be filed for every export subject to the EAR that requires

submission of a license application, regardless of the value of the export or destination.

10.     The SED or EEI is equivalent to a statement to the United States government that

the transaction occurred as described.     The SED and EEI are used by BIS, which is located in

the District of Columbia, for export control purposes.     Essential and material parts of the SED

or EEI include information concerning the ultimate consignee for the export, the country of

ultimate destination for the export, and the license authority.     In many cases, the ultimate

consignee, country of ultimate destination, or license authority for an export determines whether

the goods may be exported (a) without any specific authorization from the United States

government; (b) with a specific authorization or a license from the DoC; or (c) whether the goods

may not be exported from the United States at all.

**The Pakistan Atomic Energy Commission and the Chashma II Nuclear Power Plant**

11.     The Pakistan Atomic Energy Commission ("PAEC") is the science and technology organization in Pakistan responsible for, among other things, Pakistan's nuclear program, including the development and operation of nuclear power plants in Pakistan.

12.     In November 1998, following Pakistan's first successful detonation of a series of nuclear devices, BIS added the PAEC, as well as its subordinate nuclear reactors and power plants, to the list of prohibited end-users under the Export Administration Regulations (EAR). The PAEC and its subordinate nuclear reactors and power plants have remained on the Entity List since November 1998.   As such, the export, reexport, and transshipment of any items subject to the EAR for use by the PAEC or in its nuclear reactors and power plants, including the Level 1 Nuclear Coatings, was unlawful absent a license from the DoC in the District of Columbia.

13.     In 2006, Chashma II was a PAEC nuclear power plant under construction in Pakistan.   Because it was a PAEC nuclear power plant, export and reexport of any items subject to the EAR for use at Chashma II, including the Level 1 Nuclear Coatings, required a license from the DoC.

14.     Section 734.2(b)(1) of the EAR defined "export" to mean, in pertinent part, "an actual shipment or transmission of items subject to the EAR out of the United States."   Section 734.2(b)(4) of the EAR defined "reexport" to mean, in pertinent part, the "actual shipment or transmission of items subject to the EAR from one foreign country to another foreign country."

## PPG Industries' Level 1 Nuclear Coatings

15.     At one of its factories in Watertown, Connecticut, PPG Industries manufactured

high-performance epoxy coatings that were tested and certified for use inside the Level 1

containment area of a nuclear reactor.   The Level 1 containment area is the area immediately

surrounding a nuclear reactor's core.   In the United States, ASTM International ("ASTM")

develops and publishes standards for such Level 1 Nuclear Coatings.   The Level 1 Nuclear

Coatings were tested and certified as passing the "American Standard," i.e., testing standards

established by the American National Standards Institute (ANSI) and the American Society for

Testing and Materials (ASTM) that ensure that the Level 1 Nuclear Coatings could withstand the

harsh environment encountered inside the containment area of a reactor, especially during a loss

of coolant accident.   The paint system included a two-part epoxy base coat (product codes

KL65487107A and KL65487107B), an epoxy top coat (product code KLD19140 and KLD1B),

and a thinner, or solvent (product code KL4093) (together, "the Level 1 Nuclear Coatings").

16.     T he Level 1 Nuclear Coatings were designated EAR 99 by the DoC, meaning

they were items subject to the EAR, and thus subject to DoC's export control authority.

## The Chashma II Contract for PPG Industries' Level 1 Nuclear Coatings

17.     In  or around December 2005, PPG Paints Trading entered a contract with

defendant **HUAXING** for the supply of PPG Level 1 Nuclear Coatings for application by

defendant **HUAXING** inside the containment area of the reactor at Chashma II (the "Chashma II

Contract").   The design specifications for the Chashma II reactor required Level 1 Nuclear

Coatings that had passed the American Standard, i.e., that had passed ANSI and ASTM tests for

Level 1 Nuclear Coatings.   The Chashma II Contract stated that the Level 1 Nuclear Coatings

were for use at the Chashma II facility in Pakistan.

### The Defendant Huaxing is Informed of the Export License Requirement

18.     In late December 2005 and early January 2006, even prior to the execution of the

Chashma II Contract, a representative of PPG Paints Trading communicated to defendant

Huaxing that a U.S. export license would be required for the shipments under the Chashma II

Contract.

19.     On or about January 11, 2006, a representative of defendant HUAXING sent an

email to PPG Paints Trading which stated that he was "worried" that "it takes us a lot of time

waiting for the license," and "advised . . . that [PPG Paints Trading] can transport products in

Hong Kong and then transport in Pakistan."   Similarly, on or about January 16, 2006, a

representative of defendant HUAXING sent a fax to PPG Paints Trading which stated:

> Regarding the direct shipment of PPG coatings to Pakistan, based on recent
> written correspondence and telephone conversations between both parties, it
> appears that the license will be very difficult for your company to obtain.   The
> [Chashma II] project Management Department signed five similar supply
> contracts and was unable to achieve direct shipment to Pakistan; in the end, the
> contract could only be fulfilled by using the method of a transfer shipment
> through a third location.   Therefore, we ask your company to consider using third
> location transfer shipments as the solution in order to ensure that the materials can
> be supplied on schedule!   Please contact our company promptly regarding the
> dispatch of coatings.

### The Export License Application

20.     On or about January 20, 2006, PPG Industries, on the advice of counsel,

submitted a license application to the DoC in the District of Columbia for authorization to export

the Level 1 Nuclear Coatings for application at the PAEC nuclear power plant (the "Export

License Application") called for under the Chashma II Contract.   Representatives of defendant

HUAXING provided various information and declarations in support of the Export License Application attesting that the Level 1 Nuclear Coatings would be used only at the Chashma II site and would not be diverted to other prohibited nuclear activities.

**Defendant HUAXING is Informed of the Export License Application's Denial**

21.     On or about April 10, 2006, the DoC notified PPG of its intent to deny the Export License Application because the "proposed export poses an unacceptable risk of diversion to activities which raise concerns described under Section 744.2 of the Export Administration Regulations."   Section 744.2 of the EAR describes nuclear activities of significant concern to the United States, i.e., nuclear explosive activities and unsafeguarded nuclear fuel cycle activities including facilities for the fabrication of nuclear reactor fuel containing plutonium.

22.     Following an unsuccessful administrative appeal of the DoC's notice of its intent to deny the Export License Application, on or about June 9, 2006, PPG Industries was informed that the Export License Application would be denied by the DoC. The license denial was issued by the DoC on June 14, 2006.   The following explanation was provided for the denial: "The DoC has concluded that this export would be detrimental to the U.S. Nuclear Non-proliferation policy," and incorporated by reference the reasons provided in the April 10, 2006, intent to deny letter, i.e., the "proposed export poses an unacceptable risk of diversion to activities which raise concerns described under Section 744.2 of the Export Administration Regulations."

23.     On or about June 9, 2006, PPG Industries notified Xun Wang and other PPG Paints Trading representatives that the License Application had been denied and that they "must abide by the ruling" of the DoC.   PPG Industries further instructed Xun Wang and other PPG Paints Trading representatives that defendant HUAXING be advised as soon as possible that the

License Application had been denied to allow defendant **HUAXING** time to acquire other products.

24.     In response, on or about June 9, 2006, other PPG Paints Trading representatives informed PPG Industries that defendant **HUAXING** had been informed of the license denial and that efforts were being made to help defendant **HUAXING** select a supplier of Level 1 Nuclear Coatings other than PPG Industries.

25.     At no time did PPG Industries, PPG Paints Trading, Xun Wang, defendant **HUAXING**, or anyone else, receive or possess a license or authorization from the DoC, located in the District of Columbia, to export and reexport goods, technology or services, of any description, to the PAEC or its nuclear reactors and power plants.

### The Conspiracy to Violate the International Emergency Economic Powers Act

26.     In fact, beginning on or about June 15, 2006, and continuing through in or about March 2007, within the District of Columbia and elsewhere, defendant **HUAXING** did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to violate the IEEPA and the EAR by causing the Level 1 Nuclear Coatings, which **HUAXING** knew were destined for Chashma II, a PAEC nuclear power plant, to be exported, reexported, and transshipped from the United States to Chashma II in Pakistan, via the PRC, without first obtaining the required licenses or authorizations from the DoC, located in the District of Columbia; and to defraud the DoC and the United States government by interfering with and obstructing a lawful government function, that is, the administration and enforcement of laws and regulations prohibiting the export, reexport or transshipment of goods from the United

States to Chashma II, a PAEC nuclear power plant without a license, by deceit, craft, trickery, and dishonest means.

27.     Specifically, on or about June 15, 2006, outside the United States, defendant **HUAXING** met with Xun Wang and other co-conspirators and agreed upon a scheme whereby PPG Paints Trading could satisfy its obligations under the Chashma II Contract by supplying the Coatings to defendant **HUAXING** through a third-party distributor in the PRC for application at Chashma II.    The goal of involving the third-party Chinese distributor was to structure the transaction so as to conceal the true end-user of the Level 1 Nuclear Coatings from the United States, thereby evading the prohibitions and licensing requirements of the IEEPA and the EAR, and avoiding breach of the Chashma II Contract.

28.     On or about June 15, 2006, outside the United States, Xun Wang and other co-conspirators agreed that Company A would be the third-party distributor that would supply the Coatings under the Chashma II Contract to defendant **HUAXING** for application at Chashma II.

29.     On or about June 15, 2006, outside the United States, Xun Wang and other co-conspirators, agreed that the end-user for the Coatings shipments under the scheme would be falsely identified as the Dalian Shi Zi Kou Nuclear Power Station, a nuclear power plant that was purportedly under construction in the PRC, the export of Coatings to which would not require a DoC license.

30.     On or about June 16, 2006, Xun Wang sent an e-mail to PPG Industries wherein she omitted the material facts that PPG Paints Trading would continue to supply defendant **HUAXING** with Level 1 Nuclear Coatings under the Chashma II Contract through a third party

and would falsely identify the Dalian Shi Zi Kou Nuclear Power Station as being the end-user for the shipments.

## The Three Illegal Exports

31.     On or about June 20, 2006, defendant **HUAXING** issued a purchase order to Company A who then sent a purchase order to PPG Paints Trading for two shipments of Level 1 Nuclear Coatings intended for application at Chashma II -- namely, approximately 160 gallons of KL65487107A, 40 gallons of KL65487107B, and 40 gallons of KL4093 to be delivered in the first shipment ("the First Shipment of Level 1 Nuclear Coatings"), and approximately 80 gallons of KL65487107A, 20 gallons of KL65487107B, and 20 gallons of KL4093 to be delivered in the second shipment ("the Second Shipment of Level 1 Nuclear Coatings").   The purchase order issued by **HUAXING** was on letterhead that stated "China Nuclear Industry Huaxing Construction Co. Ltd. Chasma 2 Project."   **HUAXING's** purchase order made no mention of the Dalian Shi Zi Kou Nuclear Power Station or any other facility.   Company A's purchase order falsely stated that the two shipments of Level 1 Nuclear Coatings were to be used at the "Dalian Shi Zi Kou Nuclear Power Station."

32.     On or about June 21, 2006, a member of the conspiracy caused a purchase request to be sent from PPG Paints Trading to PPG Industries requesting that PPG Industries in the United States produce the First Shipment of Level 1 Nuclear Coatings and deliver it to PPG Paints Trading in Shanghai, PRC.

33.     On or about July 12, 2006, a member of a conspiracy caused an e-mail to be sent to PPG Industries falsely stating that the end-user for the First Shipment of Level 1 Nuclear Coatings was the "Da Lian Shi Zi Kou Nuclear Power Station."

11

34.     In or around July 2006, a member of the conspiracy caused PPG Industries to export the First Shipment of Level 1 Nuclear Coatings from the United States to PPG Paints Trading in Shanghai, PRC, for delivery to defendant **HUAXING**, via Company A, without having obtained the requisite license or authorization from the DoC for its ultimate destination, Chashma II, a PAEC nuclear power plant.

35.     In or around July 2006, as the result of the false statements made by, or caused to be made by, a member of the conspiracy concerning the end-user of the First Shipment of Level 1 Nuclear Coatings, PPG Industries, and its agent, filed no SED for the export.

36.     On or about July 28, 2006, following the arrival of the First Shipment of Level 1 Nuclear Coatings in the PRC, Company A sent an e-mail to PPG Paints Trading requesting additional "export" shipping documentation related to the First Shipment of Level 1 Nuclear Coatings and falsely stating that the "export" documentation was necessary for "inland transportation" of the Level 1 Nuclear Coatings to "our Dalian nuclear power customer[]."

37.     On or about August 2, 2006, Company A deposited 146,240 Chinese Yuan in a PPG Paints Trading account in payment for the First Shipment of Level 1 Nuclear Coatings.

38.     On or about August 7, 2006, a member of the conspiracy caused a purchase request to be sent from PPG Paints Trading to PPG Industries requesting that PPG Industries produce the Second Shipment of Level 1 Nuclear Coatings and deliver it to PPG Paints Trading in Shanghai, PRC.

39.     On or about August 15, 2006, a member of the conspiracy caused an e-mail to be sent to PPG Industries falsely stating that the end-user for the Second Shipment of Level 1 Nuclear Coatings was the "Da Lian Shi Zi Kou Nuclear Power Station."

40.     Between in or around September 2006 and in or around October 2006, a member of the conspiracy caused PPG Industries to export the Second Shipment of Level 1 Nuclear Coatings from the United States to PPG Paints Trading in Shanghai, PRC, for delivery to defendant **HUAXING**, via Company A, without having obtained the requisite license or authorization from the DoC for its ultimate destination, Chashma II, a PAEC nuclear power plant.

41.     Between in or around September 2006 and in or around October 2006, as the result of the false statements made by, or caused to be made by, a member of the conspiracy concerning the end-user of the Second Shipment of Level 1 Nuclear Coatings, PPG Industries, and its agent, filed no SED for the export.

42.     On or about September 19, 2006, Company A sent an e-mail to a member of the conspiracy asking how to deal with "domestic transportation expenses" of "RMB3369.63" and "VAT tax and fees" incurred by defendant **HUAXING** with regard to First Shipment of Level 1 Nuclear Coatings, a sum that included delivery costs in Pakistan.

43.   On or about September 21, 2006, a member of the conspiracy sent an e-mail approving reimbursement to Company A of the "freight expense" incurred by defendant **HUAXING** for First Shipment of Level 1 Nuclear Coatings and passed through to Company A.

44.     On or about October 9, 2006, Company A sent an e-mail to a member of the conspiracy requesting reimbursement "on the next order of ours" for "5% value of the invoice (for the 1st delivery to [defendant **HUAXING**]) as the tax related charges" and also a "domestic transportation charge" of "RMB3369.63," a sum that included delivery costs in Pakistan.

45.     On or about October 9, 2006, a member of the conspiracy sent an e-mail to Company A approving Company A's request for reimbursement "on the next order" for "5% value of the invoice (for the 1st delivery to [defendant **HUAXING**]) as the tax related charges" and a "domestic transportation charge" of "RMB3369.63."

46.     On or about October 16, 2006, Company A sent an amended purchase order to PPG Paints Trading "for the delivery to [defendant **HUAXING**]" that reflected a purchase price of 69,020 Chinese Yuan.

47.     On or about October 19, 2006, Company A deposited 69,020 Chinese Yuan in a PPG Paints Trading account in payment for the Second Shipment of Level 1 Nuclear Coatings.

48.     On or about October 19, 2006, defendant **HUAXING** issued a purchase order to Company A who then sent a purchase order to PPG Paints Trading for a shipment of Level 1 Nuclear Coatings intended for application at Chashma II – namely, approximately 80 gallons of KL65487107, 20 gallons of KL65487107B, 75 gallons of KLD19140, 50 gallons of KLD1B, and 40 gallons of KL4093 ("the Third Shipment of Level 1 Nuclear Coatings").   The purchase order issued by **HUAXING** was on letterhead that stated "China Nuclear Industry Huaxing Construction Co. Ltd. Chasma 2 Project."   **HUAXING's** purchase order made no mention of the Dalian Shi Zi Kou Nuclear Power Station or any other facility.

49.     On or about October 23, 2006, a member of the conspiracy caused an email to be sent from PPG Paints Trading to PPG Industries containing a purchase request requesting that PPG Industries in the United States produce the Third Shipment of Level 1 Nuclear Coatings and deliver it to PPG Paints Trading in Shanghai, PRC, and falsely stating that the end user for the

14

Third Shipment of Level 1 Nuclear Coatings was the "Da Lian Shi Zi Kou Nuclear Power Station."

50.     Between in or around December 2006 and in or around January 2007, a member of the conspiracy caused PPG Industries to export the Third Shipment of Level 1 Nuclear Coatings from the United States to PPG Paints Trading in Shanghai, PRC, for delivery to defendant **HUAXING**, via Company A, without having obtained the requisite license or authorization from the DoC for its ultimate destination, Chashma II, a PAEC nuclear power plant.

51.     On or about February 14, 2007, a member of the conspiracy caused to be made false statements as to material facts in an SED filed on behalf of PPG Industries, namely that the ultimate consignee of the Third Shipment of Level 1 Nuclear Coatings was PPG Paints Trading, that the ultimate country of destination of the shipment was "China (Mainland)" and that no license was required for the shipment.

52.     In January 2007, having discovered the illegal export scheme, PPG Industries ordered PPG Paints Trading not to sell or transfer the Third Shipment of Level 1 Coatings to defendant **HUAXING**.   The Third Shipment of Level 1 Nuclear Coatings was then returned to the United States before reaching Pakistan, and turned over to BIS custody.

53.     On or about March 1, 2007, following PPG Industries' halt of the Third Shipment of Level 1 Nuclear Coatings, defendant **HUAXING** sent notification to PPG Paints Trading claiming that the non-delivery of the Third Shipment of Level 1 Nuclear Coatings amounted to a breach of the Chashma II Contract.

54.     The proceeds obtained, directly or indirectly, by PPG Industries or PPG Paints

Trading, as the result of the offenses alleged in Counts One through Three of the Information

were $32,319.

### Limited Nature of Factual Proffer in Support of Guilty Plea

55.     This factual proffer is <u>not</u> intended to constitute a complete statement of all facts

known by the United States or defendant **HUAXING**, but is intended to provide the necessary

factual predicate for defendant **HUAXING's** plea of guilty to the Information.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

G. MICHAEL HARVEY (D.C. Bar No. 447465)
Assistant United States Attorney
National Security Section
555 Fourth Street, NW (11th Floor)
Washington, D.C. 20530
(202) 252-7810
Michael.Harvey2@usdoj.gov

November 26, 2012

16

## Defendant's Stipulation and Signature

I am authorized to act on behalf of defendant China Nuclear Industry Huaxing Construction Co., Ltd., in this matter.

On behalf of defendant China Nuclear Industry Huaxing Construction Co., Ltd., after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above proffer of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

China Nuclear Industry Huaxing Construction
Co., Ltd.

Date: 2012.11.16

ZHANG XIAOMING
Director of Risk Control Department
China Nuclear Industry Huaxing
Construction Co., Ltd.

2012.12.3

## Attorney's Acknowledgment

I am counsel for defendant China Nuclear Industry Huaxing Construction Co., Ltd., I have carefully reviewed the above proffer of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

Date: Nov. 26, 2012

12/3/12

SOTIRIS A. PLANZOS, ESQ.
Attorney for China Nuclear Industry Huaxing
Construction Co., Ltd.

17